07 CV 6625

Judge Pauley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

　　　　　　Plaintiff,

　　v.

SHANE BASHIR SUMAN and
MONIE RAHMAN,

　　　　　　Defendants.

---

Case No.

RECEIVED
JUL 24 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1. This is an insider trading case involving transactions in the securities of Molecular Devices Corporation ("Molecular") by Shane Bashir Suman, formerly an information technology specialist at MDS Inc. ("MDS"), and his wife, Monie Rahman. Defendants Suman and Rahman traded in advance of the January 29, 2007 public announcement (the Announcement") that MDS would commence a cash tender offer for Molecular. Under the terms of the tender agreement, MDS would pay $35.50 per share for all outstanding common shares of Molecular.

2. After the Announcement, Molecular's share price soared more than 46% to $35.07 and the trading volume spiked 50-fold.

3. From approximately December 15, 2006 through January 28, 2007, Suman,

in his capacity as an information technology specialist at MDS, had access to a vast amount of confidential corporate information. For example, Suman's position afforded him access to a large number of critical e-mails related to the impending transaction between MDS and Molecular, which were maintained on a secure website by MDS for due diligence purposes.

4. Suman and Rahman subsequently used the material, nonpublic information garnered from those e-mails (and from other sources) to reap ill-gotten gains by trading in Molecular securities. From January 24 through January 26, 2007, Suman and Rahman purchased 900 Molecular call options and 12,000 shares of Molecular common stock in an account held by Rahman.

5. As a result of their unlawful conduct, Suman and Rahman unjustly enriched themselves by more than one million dollars ($1,000,000).

6. By virtue of their conduct, Suman and Rahman violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 [17 C.F.R. § 240.10b-5] and 14e-3 [17 C.F.R. § 240.14e-3] promulgated thereunder, and unless enjoined will continue to engage in acts, practices, and courses of business similar to those alleged in this Complaint.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

8. Defendants Suman and Rahman made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and courses of business alleged herein, certain of which occurred within the

Southern District of New York. Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

## THE PARTIES

9. Defendant Monie Rahman ("Rahman"), age 36, is a Canadian citizen who has resided in North Logan, Utah since June 2006. Rahman has been married to Shane Bashir Suman since 2003.

10. Defendant Shane Bashir Suman ("Suman"), age 34, is a resident of Ontario, Canada and worked as an information technology specialist for MDS. Suman has been married to Monie Rahman since 2003.

## RELATED ENTITIES

11. Throughout its history, Molecular Devices Corporation was a Sunnyvale, California-based company that designed systems and software to accelerate the pace of drug development. Molecular's common stock was traded on the NASDAQ National Market system under the symbol "MDCC." Molecular stock options were listed and traded on the Chicago Board Options Exchange and the Philadelphia Stock Exchange.

12. MDS Inc. is a Toronto-based company whose stock is quoted jointly on the Toronto Stock Exchange and the New York Stock Exchange. MDS produces medical devices, which are used by pharmaceutical and biotechnology companies to research, diagnose and treat diseases.

## FACTUAL ALLEGATIONS

13. On November 7, 2006, Molecular entered into a confidentiality agreement with its corporate financial advisor, UBS Securities LLC ("UBS"), in connection with a potential business combination. Among other things, this agreement required that "[f]or

a period of 12 months from the date of th[e] Agreement, UBS w[ould] keep confidential any material nonpublic information" made available to UBS by Molecular.

14. On November 22, 2006, UBS entered into its own confidentiality agreement with MDS in connection with its evaluation of MDS's possible tender offer for Molecular shares. The agreement with UBS required MDS to inform its employees that information concerning Molecular was confidential and should not be misused. Further, the agreement stated that "United States securities laws impose restrictions on trading in securities when in possession of [material nonpublic information]."

15. On December 28, 2006, Suman signed an employee confidentiality pledge that stated that neither he nor his family members would use or disclose confidential information that he learned during the course of his employment at MDS. By signing this pledge, Suman assumed a fiduciary duty of trust and confidence to his employer MDS.

16. During the relevant period, Suman's duties and responsibilities as an information technology specialist at MDS included administering and repairing the e-mail network for company employees. In order to carry out his duties, Suman was entrusted with, and had ready access to, nonpublic information concerning MDS's impending tender offer for Molecular.

17. Specifically, Molecular created a secure website to collect and manage information regarding the tender offer. As part of this effort, Molecular generated an e-mail access list for employees involved in the potential business transaction. When new information was added to the secure website, a mass e-mail with the "from" line reading "Molecular Devices Corporation" was automatically generated and sent to everyone on the access list. The subject line on those e-mails read "Project Monument," the code

name for the pending transaction between MDS and Molecular. In the six weeks leading up to the Announcement, approximately 500 such e-mails were disseminated. As part of his responsibilities at MDS, Suman had access to this e-mail traffic.

18. Also, MDS's e-mail system encountered a number of problems throughout December 2006 and January 2007. As an e-mail system administrator, Suman had access to the contents of many MDS employees' e-mail messages when he provided technical support. By virtue of his role as an information technology specialist for MDS, Suman had many opportunities to learn of the impending transaction between MDS and Molecular.

19. For example, late in the morning of January 23, 2007, Suman was called to restore an electronic document titled "Andy Monument Message." The title referred to Andy Boorn, the president of an MDS subsidiary then known as MDS Sciex. This document was to be distributed to MDS employees after the Announcement in order to explain to them the significance and impact of the MDS-Molecular transaction. Although Suman was not able to retrieve the document, the MDS employee who had lost the document explained to Suman that the file was highly confidential and that, if he was able to find it, he was not allowed to read it.

20. After attempting to locate the "Andy Monument Message" document, Suman shortly thereafter started to search the internet for information related to the MDS-Molecular transaction. The internet browser history on Suman's work computer revealed that in the early evening of January 23, 2007, Suman was running multiple internet searches for "Molecular Devices" and "Monument." He also logged onto www.monument-inc.com. The browser history further illustrated that Suman went back

and forth between searches focused on "Molecular" and those focused on "Monument." Suman also visited an internet message board devoted to Molecular Devices. Although that message board contained some speculation about a possible takeover of Molecular, MDS was not mentioned as a potential acquirer.

21. On January 23, 2007 at 7:41 p.m. EST, Suman called Rahman and the two spoke for 100 minutes.

22. On January 24, 2007, starting at 9:33 a.m. EST and continuing throughout that day, Rahman placed limit orders to purchase a total of 32,000 shares of Molecular stock in an account she held at E*Trade Canada Securities Corporation (the "E*Trade Account"). Ultimately, orders for only 12,000 Molecular shares were executed that day, at an average price of approximately $24 per share.

23. From January 24 to January 26, 2007, Suman and Rahman bought 900 Molecular call options in the E*Trade Account. Each of these call options gave Suman and Rahman the right to purchase 100 Molecular shares, at an exercise price of $25.00, by expiration dates set in February, March and April of 2007. Thus, defendants' 900 Molecular call options gave them the right to purchase 90,000 shares of Molecular stock.

24. Suman, who accessed the E*Trade Account from Canada, bought 870 of the 900 Molecular call options.

25. Rahman, who accessed the E*Trade Account from Utah, bought 30 of the 900 Molecular call options.

26. A portion of the Molecular securities purchases were financed with a margin loan of approximately $200,000.

27.     On the morning of January 29, 2007, MDS and Molecular publicly announced a $615 million tender offer pursuant to which MDS would purchase all of the outstanding shares of Molecular.

28.     News of the Announcement caused the value of Molecular's stock to rise sharply from a closing price of $23.88 on Friday, January 26, 2007 to a closing price of $35.07 on Monday, January 29, 2007.

29.     As a result of the transactions in Molecular securities described above, Suman and Rahman jointly realized illegal profits exceeding $1,000,000. Specifically, Suman's purchase of 870 Molecular call options resulted in ill-gotten gains of approximately $845,000. Rahman's purchase of 12,000 Molecular shares and 30 Molecular call options resulted in ill-gotten gains of approximately $160,000.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]

30.     Paragraphs 1 through 29 are re-alleged and incorporated herein by reference.

31.     Defendant Suman owed a fiduciary duty of trust and confidence to his employer MDS, which prohibited him from, among other things, using or disclosing material, nonpublic information learned during the scope of his employment.

32.     At all relevant times, Suman knew or was reckless in not knowing that the information concerning MDS's tender offer for Molecular shares was material, confidential, and nonpublic. In breach of a duty of trust and confidence that he owed to

MDS, and on the basis of this material, nonpublic information, Suman purchased Molecular call options.

33. Suman further knew or was reckless in not knowing that the information concerning the transaction between MDS and Molecular that he learned during the scope of his employment was nonpublic and material at the time that he tipped his wife, defendant Rahman.

34. By communicating the material, nonpublic information concerning the transaction between MDS and Molecular to his spouse Rahman, Suman made a gift of that information to her and in return he received a personal benefit.

35. In communicating that material, nonpublic information under these circumstances to Rahman, Suman knowingly or recklessly breached a fiduciary or similar duty of trust and confidentiality that he owed to his employer MDS.

36. Rahman also knew or should have known that the information about the MDS-Molecular transaction that she received from Suman had been communicated to her in breach of Suman's fiduciary duty of trust and confidence that he owed to his employer MDS. Rahman thus assumed the same duties that Suman owed to MDS. By purchasing Molecular shares and call options, Rahman also breached those duties.

37. By the conduct described above, defendants Suman and Rahman directly or indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of Section 14(e) of the Exchange Act
[15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. §240.14e-3]**

38. Paragraphs 1 through 37 are re-alleged and incorporated herein by reference.

39. By November 22, 2006, MDS had taken a substantial step or steps to commence a cash tender offer to purchase the outstanding public shares of Molecular.

40. Beginning on or about January 24, 2006, defendants Suman and Rahman engaged directly or indirectly in fraudulent, deceptive or manipulative acts or practices in connection with the tender offer for Molecular's stock by (i) purchasing or causing to be purchased the securities of Molecular while in possession of material, nonpublic information related to the tender offer, which information they knew, or were reckless in not knowing, was obtained directly or indirectly from the companies involved in the transactions or a person acting on behalf of one or more of the companies; or (ii) communicating to others material nonpublic information relating to the tender offer for Molecular's stock, under circumstances in which it was reasonably foreseeable that such communications were likely to result in the purchase or sale of the securities of Molecular.

41. By reason of the foregoing, Suman and Rahman directly and indirectly, violated Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court:

(A) Enter judgment in favor of the Commission finding that defendants Suman and Rahman each violated the federal securities laws and the rules promulgated thereunder as alleged herein;

(B) Permanently enjoin defendants Suman and Rahman from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 [17 C.F.R. §§ 240.10b-5 and 240.14e-3] thereunder;

(B) Order defendants Suman and Rahman to jointly and severally disgorge all ill-gotten gains, including prejudgment interest thereon, resulting from the illegal trading alleged herein;

(C) Order defendants Suman and Rahman to each pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

(D) Grant such other relief as this Court deems just and proper.

Dated: July 24, 2007

Respectfully submitted,

*[signature]*

Dean M. Conway (Lead Counsel)
 *Assistant Chief Litigation Counsel*
Richard E. Simpson, RS-5859
 *Assistant Chief Litigation Counsel*
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4010
Telephone: (202) 551-4412 (Conway)
Facsimile: (202) 772-9246 (Conway)
conwayd@sec.gov

Counsel for Plaintiff

- 11 -

Of Counsel:
Cheryl Scarboro, *Associate Director,*
  *Division of Enforcement*
John Reed Stark, *Chief,*
  *Office of Internet Enforcement*
Thomas A. Sporkin, *Deputy Chief*
  *Office of Internet Enforcement*
David Smyth
  *Senior Counsel*